### MEADOWS et al. v. CONTINENTAL ASSUR. CO.

No. 7935.

Circuit Court of Appeals, Fifth Circuit.

March 23, 1937.

R. Wayne Lawler, of Houston, Tex., for appellants.

Albert P. Jones, of Houston, Tex., for appellee.

Before FOSTER, SIBLEY, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

The plaintiff-appellants' suit on two policies of insurance on the life of Columbus B. Meadows, identical except as to amount, was tried by the judge without a jury on facts in part stipulated and in part proven without conflict, and terminated in a judgment for the insurer-appellee. Four questions are presented: (1) Whether oral evidence as to the meaning in the policies of the words "default" and "date of default" was binding on the court in construing them; (2) whether extended insurance began on the date the last premium was payable or at the end of the grace period; (3) whether these policies are to be treated as in force from the date July 9, 1926, as they state, or from August 9, 1926, when by acceptance they really went into effect; (4) whether there was usury in loans against the policies which by reducing them and increasing the net cash value would enlarge the extended insurance to a time beyond death.

After paying premiums in cash or by loans against the policies for six years, Meadows failed to pay on July 9, 1932, or to take any steps to surrender or reinstate the policies before his death October 15, 1932. Important provisions of the policies are:

"The first premium shall be paid on or before the delivery of this policy and a like premium shall be paid on or before the 9th of July in each and every year until the death of the insured or until the maturity of this policy as an endowment. After the delivery of this policy to the insured and the payment of the first pre-

258

mium it shall take effect as of the 9th day of July, 1926.

"All premium is payable in advance. * * * Except as herein provided, the payment of a premium shall not maintain the policy in force beyond the date when the next premium is due.

"A grace of thirty-one days will be allowed in the payment of any premium after the first, and during this time the insurance shall continue in force. If death occurs within the period of grace the premium for the then current policy year or any unpaid instalment thereof will be deducted from the amount payable hereunder.

"In the event of default in the payment of any premium after this policy shall have become entitled to a surrender value and if the insured does not within three months from the date of default elect to surrender this policy to the Company for cash or for the paid up policy it shall be automatically continued under the third option 'policy values' provided on the third page hereof.

"After this policy shall have been in force three full years, upon default in the payment of any premium or within three months after such default, the insured upon notifying the Company in writing may elect one of the following options. * * * Third—To have insurance for the face amount of this policy, less any indebtedness to the Company hereon, continue from the date of default, without the right of cash loans, for such term as the net cash value will purchase."

The extended insurance would cover seventy-nine days according to the evidence, which would not carry the insurance until October 15th, if it commenced July 9th, but would if it commenced August 9th.

■ 1. In support of the contention that the "date of default" is not the due date of the premium but the last day of the grace period, four men engaged in the life insurance business in Houston, Tex., where these policies were applied for and delivered, testified thus: "In July and August, 1926, there was a general understanding or common acceptation of the meaning of default or date of default or time of default as those terms are used in the ordinary policy of life insurance among people engaged in the business with respect to the payment or nonpay-

ment on the due date or anniversary date of premiums. That common use, definition and acceptation was that the premium was not in default until the end of the grace period. * * * A premium can be paid at any time during the grace period and the policy would remain in force and effect and the Company would have to accept any payment during the grace period." The witnesses seem to say that a default in premium is not considered to occur until it has become irretrievable, not curable by payment. But they really testify to no usage or course of business; they cite no instances in which a policy provision like that before us has been acted on as meaning what they say. Their testimony is indeed no more than an opinion as to what the words ought to be held to mean. But the words are not technical words of art on whose meaning a court needs information from experts. They are common English words. The insurer put them into the policy in Chicago and the deceased accepted them as the contract in Houston. The court, although it heard the opinion of these men in Houston as to the meaning of the words, was not bound to follow that opinion, but was rather bound to judge for itself what their meaning in the contract is. Evidence of usage was disregarded as against the meaning of the words of the policy in Orient Insurance Co. v. Wright, 1 Wall. 456, 468, 17 L.Ed. 505. In the same connection it was held in Hearne v. Marine Ins. Co., 20 Wall. 488, 492, 22 L.Ed. 395: "Usage is admissible to explain an ambiguity, but it is never received to contradict what is plain in a written contract. If the words employed have an established legal meaning, parol evidence that the parties intended to use them in a different sense will be rejected, unless if interpreted according to their legal acceptation, they would be insensible with reference to the context or the extrinsic facts." Again in Home Ins. Co. v. Baltimore Warehouse Co., 93 U.S. 527, 541, 23 L.Ed. 868, we read: "It is as true of policies of insurance as it is of other contracts, that, except when the language is ambiguous, the intention of the parties is to be gathered from the policies alone." In Penman v. St. Paul Ins. Co., 216 U. S. 311, 322, 30 S.Ct. 312, 315, 54 L.Ed. 493, where parol testimony had been admitted to show that blasting powder was not considered in a mining community to be

included in the policy words "other explosives," the court declared: "The company could have used no words which would have been more explicit. There is no ambiguity about them. Parol testimony was not needed nor admissible to interpret them. They constituted the contract between the company and the insured." The policies here were proposed by the insurer and accepted by the insured as written. There is no issue of accident or mistake in their wording. The sole question is their meaning. As will be shown, they have a sensible, clear meaning in the common acceptation of common words of our language. Though the parol evidence was apparently admitted without objection, the court was not bound to follow it in construing the written contracts.

2. The term "default" is not defined in the policy. By its derivation it means failure. Webster's International Dictionary defines the verb in a sense here appropriate thus: "To fail in fulfilling a contract, agreement or duty, especially a financial obligation"; and the noun as "A failing or failure, omission of that which ought to be done." When a definite time is appointed to pay an insurance premium and it is not then paid, it seems plain to us that a default has occurred, and that its date is the date appointed for the payment. If there were no grace provision, there could be no argument to the contrary. The grace clause, now almost universal, and required in Texas policies by statute, Rev.Civ.Stats. art. 4732, subd. 2, is not for the purpose of changing the date when the premium ought to be paid, but to provide a period in which the default in payment may be retrieved and corrected without complete loss of the policy. It operates according to its terms. If death occurs during the grace, the policy must be paid, but not because the defaulted premium was not due till the end of the grace, for it is recognized as due by the statute and these policies and to be deducted from the amount to be paid by the insurer. The general subject was recently fully discussed in Ratliff v. Kentucky Home Mutual Life Ins. Co., (C.C.A.) 87 F.(2d) 965. We there refused to follow Mitchell v. Southern Union Life Ins. Co. (Tex.Civ.App.) 218 S.W. 586, strongly relied on by appellants here, and held that case was not approved by the Supreme Court of Texas in Missouri State Life Ins. Co. v. Carey, 276 S.W. 227. In the policy before us default in the payment of the premium occurred when it was not paid at the appointed time; the three months then began to run within which the insured must have elected which of his policy options he would choose; and if by his choice or his failure to choose the third option is to be applied, the extended insurance is to be computed from the date the premium was payable, as held in the Ratliff Case.

Appellants argue that this makes two insurances to run at the same time during the grace. We do not so understand it. There is one insurance for one certain amount under the one policy, but there is uncertainty whether a new premium will be paid for a whole year, or whether a value inherent in the policy will be used to carry on the insurance for a term depending on the amount of that value. There is to be no period of free insurance. If insured neither dies nor pays his premium by the end of the grace period, and as appellants contend if extended insurance begins only then, insurance during the grace period would be had without premium. To prevent this the extended insurance is expressly made "from date of default."

3. But it is said the true date for the payment of the premium is not July 9th but August 9th, since on the latter date the policies really became effective, citing McMaster v. New York Life Ins. Co., 183 U.S. 25, 22 S.Ct. 10, 46 L.Ed. 64, and other cases. The facts are these: Meadows, at Houston, first applied for a policy of $10,000 at a stated premium, sending in his medical examination. The Houston agent privately asked that two additional policies be issued, thinking he could get Meadows to take them. The company issued the three on July 9th, but at a higher premium rate. The agent did not attempt to deliver them, but returned them, asking that they be issued on the rate stated in the application. On July 16th the company issued three policies accordingly, but put in each the words: "The first premium shall be paid on or before the delivery of this policy and a like premium shall be paid on or before the 9th day of July in each and every year until the death of the insured or until the maturity of this policy as an endowment. After the delivery of this

policy to the insured and the payment of the first premium it shall take effect as of the 9th day of July, 1926." There was also a provision: "The first year's insurance under this policy is term insurance," and "Except as herein provided the payment of a premium shall not maintain the policy in force beyond the date when the next premium is due." These policies were presented to Meadows, and on August 9th he accepted and paid for two, but rejected the third.

It is clear that the minds of the parties never met in a binding contract until August 9th. Meadows was not bound to accept even one policy, because, as first issued, of the increased premium, as last issued because of the backdating. The contract was made by accepting the policies, and is expressed in them. The insured had in them gotten the premium rate he desired, and the company had dated the policies as it desired. The first premium purchased term insurance which by special agreement began July 9, 1926, and expired when the second premium was due July 9, 1927. From then on each premium paid carried the insurance a full year. The agreed dating of the policies as of July 9th made them cover a month during which there was really no insurance, but it secured to the insured not only the lower premium rate but resulted also in accelerating all the benefits under the policies which depended on the lapse of time. The company would be estopped with reference to them to question its agreement that the policies took effect as of July 9, 1926. The premium rate not being fixed by law, and the parties being free to contract as they chose on the matters affected, they are bound by the contracts they made. McCampbell .v. New York Life Ins. Co. (C.C.A.) 288 F. 465.

■■■ 4. Meadows made loans against his policies which are deductible from the cash values of the policies to ascertain the reserve available to purchase the extended insurance. As the debt is lessened, that insurance is lengthened. Usury is claimed by appellants in the loans, as a result of which under the Texas law all payments of interest are to be applied on the principal. Appellee contends that the advance made against each policy is a separate contract which by its express terms · is to be governed by the laws of

Illinois, the place of the company's home office, under which laws it is valid. To support that contention may be cited our recent decision in Armstrong v. Alliance Trust Co., 88 F.(2d) 449, which related to an independent contract of borrowing. But appellants reply that this advance was obligatory under policies which are Texas contracts, and that the money was in fact applied for in Texas and paid over in Texas, and is governed by the laws of Texas, not being an independent contract; for which may be cited Mutual Life Ins. Co. v. Liebing, 259 U.S. 209, 42 S.Ct. 467, 66 L.Ed. 900; and Aetna Life Ins. Co. v. Dunken, 266 U.S. 389, 45 S. Ct. 129, 69 L.Ed. 342. But there does not appear to have been any express agreement in the Liebing Case, as there is here, that the loan transaction was to be under a different law from that of the policy. We need not pursue the matter, however, because, assuming without deciding that this transaction was under the Texas law, we find no usury in it. The loan agreements, so far as material to this point, after acknowledging receipt of the money as an indebtedness against and a lien on the policies, say: "In consideration of the premises the undersigned hereby agrees as follows: 1. To pay said Company interest on said loan at the rate of 5½% per annum, payable in advance, from this date to the next anniversary of said policy, and annually in advance on said anniversary and thereafter. 2. To pay said Company said sum when due with interest, reserving, however, the right to pay said loan with interest at any time before due. 3. That said loan shall become due and payable (a) either if any premium on said policy or any interest on said loan is not paid on the date when due * * * (b) or (1) on maturity of the policy as a death claim or endowment; (2) on the surrender of the policy for a cash value; (3) on the selection of a discontinuing option. In any such event the amount due on said loan shall be deducted from the sum to be paid or allowed under said policy." The Texas statute, Rev.Civ.Stat. art. 5071, permits 10 per cent. to be stipulated as interest in a written contract, but voids all interest when more is provided for directly or indirectly. The argument is that, while only 5½ per cent. is directly provided for here, if after paying that interest in advance the loan should become due and payable say

within six months, the interest received would exceed 10 per cent. We do not think the contracts, fairly construed, so provide. They promise interest at the rate of 5½ per cent. per annum. That means that for a time less than a year a proportionately less interest is to be paid. If the insured desires, he may pay "the loan with interest at any time before due." This fairly means that only earned interest is to be charged in such a settlement. When maturity of the loan is accelerated by other means, the agreement is that "the amount due on the loan" is to be deducted from the sum to be paid under the policy. Again, this should be held to mean what is legally and justly due, and not to include unearned interest. The statute of Texas, art. 4732, subd. 6, deals with this matter of loans against policies, authorizing provisions for them "at a specified rate of interest," and providing "that the company may deduct from such loan value any existing indebtedness on the policy and any unpaid balance of the premium for the current policy year, and may collect interest in advance on the loan to the end of the current policy year." These policies conform to the requirements of the Texas statute, and the company in its loan agreements has not transgressed them. The statute must be construed with the usury statute, so that of course the "specified rate of interest" cannot exceed 10 per cent. per annum; but the taking a lawful rate in advance as the statute authorizes does not result in usury, since the statute says that only "existing indebtedness on the policy" is to be deducted in a settlement, and this fairly excludes unearned interest. To apply the construction for which appellant contends would prevent the charging in advance of any rate of interest on such a loan, because the event insured against which matures the policy might happen the next day and thus make any rate reserved to exceed 10 per cent. for that time. The potential usury arising from a possible acceleration which was asserted to exist in Shropshire v. Commerce Farm Credit Co., 120 Tex. 400, 30 S.W.(2d) 282, 39 S.W. (2d) 11, 84 A.L.R. 1269, and Manning v. Christian, 124 Tex. 517, 81 S.W.(2d) 54, is not generally recognized, as we stated in Armstrong v. Alliance Trust Co., supra. We do not think it ought to be inferred here, the contract not requiring that construction. In point of fact, no interest has been paid in advance since July 9, 1931, and that was fully earned by July 9, 1932.

The judgment is accordingly affirmed.